UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AMANDA MCCOY, individually and as dependent administrator of, and on behalf of, the ESTATE OF DANIEL LEE CHARLES MCCOY and DANIEL LEE CHARLES MCCOY'S heirs-at-law; | § § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 1:19-CV-1163 |
| | § | JURY DEMANDED |
| WILLIAMSON COUNTY, TEXAS; BRADLEY R. BROWN; ADRIAN D. NIRA; CARLOS A. PANIAGUA; and TY R. ROGGENKAMP, | § § § § § | |
| Defendants. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

> This is a case of tragic denial of medical and mental health care desperately needed by Daniel McCoy, a pre-trial detainee found psychologically incompetent to stand trial. Jailers moved Mr. McCoy from a vomit-filled cell to another cell and allowed him to die. Williamson County policies, practices, and customs resulted in Mr. McCoy not receiving needed care. Defendants' deliberate indifference and objective unreasonableness caused Mr. McCoy's suffering and unnecessary death.



Table of Contents

I.      Introductory Allegations ................................................................................ 4

        A.      Parties .................................................................................................. 4

        B.      Jurisdiction and Venue ....................................................................... 7

II.     Factual Allegations ........................................................................................ 7

        A.      Introduction ......................................................................................... 7

        B.      Daniel Lee Charles McCoy .................................................................. 8

        C.      Daniel's Incarceration and Death in the Williamson County Jail........... 8

                1.      Daniel's Psychiatric Condition .................................................... 8

                2.      Daniel's Horrific Suffering and Unnecessary Death ............................... 12

                        a.      Williamson County Investigation Report ..................................... 13

                        b.      Texas Rangers Report ...................................................... 15

                        c.      Georgetown Fire Department (EMS) Records ............................ 16

                        d.      Ascension Seton Williamson Hospital.......................................... 17

                        e.      Daniel's Death ................................................................ 18

                        f.      Witness Statements ......................................................... 18

                                (1)     Banks, Jordan – Medical Officer ...................................... 18

                                (2)     Berkley, Treydon – Inmate .............................................. 20

                                (3)     Brown, Bradley R. – Jailer............................................... 21

                                (4)     Busby, Jakeb – Medical Officer........................................ 22

                                (5)     Carrasquillo-Morales, Christian – Inmate........................ 23

                                (6)     Chambers, Larry – Inmate .............................................. 24

                                (7)     Cole, Rae – Field Training Officer ................................... 25

                                (8)     Lewis, Jeremy – Inmate .................................................. 25

                                (9)     McCoy, King Michael – Inmate ....................................... 25

                                (10)    Nira, Adrian D. – Sergeant/Medical Officer................... 28

                                (11)    Paniagua, Carlos A. – Sergeant/Jailer............................. 35

                                (12)    Parks, Anthony – Inmate................................................. 36

                                (13)    Perez, Jesus – Inmate ..................................................... 37

                                (14)    Patrick, Corey – Inmate ................................................. 38

                                (15)    Roggenkamp, Ty – Field Training Officer ...................... 38

                                (16)    Wheles – Medical Lieutenant ......................................... 40

        D.      Post-Death Reports ............................................................................. 40

| | 1. | Autopsy Report | 40 |
|---|---|---|---|
| | 2. | Custodial Death Report | 42 |
| E. | | Defendants' Knowledge and Education | 42 |
| F. | | Texas Commission on Jail Standards | 49 |
| G. | | *Monell* Liability of Williamson County | 49 |
| | 1. | Introduction | 49 |
| | 2. | Jail Policy Manual | 50 |
| | 3. | Inmates Allowed to Supervise Other Inmates | 50 |
| | 4. | Failing to Fund Mental Health Treatment and Allowing Prisoners to Wait Months to be Transferred to A Mental Health Hospital | 51 |
| | 5. | Incompetent Jail Medical Personnel | 52 |
| | 6. | Williamson County Violated Court Orders to Help Mentally Ill Inmates | 52 |
| | 7. | Taking Vital Signs During a Medical Incident Optional | 53 |
| | 8. | Housing Mentally and Physically Ill Prisoners in a Metal Box with a Single Window | 53 |
| | 9. | Intoxicated Prisoners Allowed | 53 |
| | 10. | Prisoner Observations Through a "Bean Hole" | 54 |
| | 11. | Inoperable Medical Equipment | 54 |
| III. | | Causes of Action | 55 |
| A. | | 14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* | 55 |
| B. | | Remedies for Violation of Constitutional Rights and Other Federal Claims | 58 |
| C. | | Cause of Action Against All Natural Person Defendants Under 42 U.S.C. § 1983 for Violation of 14th Amendment Due Process Rights to Reasonable Medical and/or Mental Health Care, to be Protected, and not to be Punished | 58 |
| D. | | Cause of Action Against Williamson County Under 42 U.S.C. § 1983 for Violation of 14th Amendment Due Process Rights to Reasonable Medical and Mental Health Care, to be Protected, and not to be Punished | 62 |
| E. | | Causes of Action Against Williamson County for Violation of Americans with Disabilities Act and Rehabilitation Act | 64 |
| IV. | | Concluding Allegations and Prayer | 67 |
| A. | | Conditions Precedent | 67 |
| B. | | Use of Documents at Trial or Pretrial Proceedings | 67 |
| C. | | Jury Demand | 67 |
| D. | | Prayer | 67 |

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff Amanda McCoy ("Amanda McCoy" or "Ms. McCoy") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times.  Amanda McCoy was Daniel Lee Charles McCoy's biological and legal mother.  Daniel Lee Charles McCoy is referred to herein at times as "Mr. McCoy" or "Daniel."  Amanda McCoy sues in her individual capacity and as the Dependent Administrator of the Estate of Daniel Lee Charles McCoy, Deceased.  Amanda McCoy, when asserting claims in this lawsuit as the Dependent Administrator, does so in that capacity and on behalf of the estate (including Mr. McCoy's heirs-at-law – Amanda McCoy, Amy Ingram, Stacy Dodd, Chris Dodd, Tiffany McCoy, Lucas Jeffery Waldie, Seth Phillip Waldie, and Cheyenne Sunset Waldie).  All of the people in the immediately preceding sentence, other than Amanda McCoy, are collectively referred to herein as the "Claimant Heirs" and were Daniel's half-siblings.  Letters of dependent administration were issued to Amanda McCoy on or about October 22, 2019, in Cause Number 33932, in the County Court at Law No. 1 of Williamson County, Texas, in a case styled *Estate of Daniel Lee Charles McCoy, Deceased*.

2.      Defendant Williamson County, Texas ("Williamson County") is a Texas county. Williamson County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Bill Gravell, Jr., at 710 S. Main Street, Suite 101, Georgetown, Texas 78626, or wherever Honorable Judge Gravell may be found. Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and

Remedies Code Section 17.024(a).  Williamson County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under color of State law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act).  Williamson County's policies, practices, and/or customs were moving forces behind constitutional violations, and resulting damages and death, referenced and asserted in this pleading.

3.     Defendant Bradley R. Brown (sometimes referred to herein as "Mr. Brown" or "Jailer Brown") is a natural person who resides, is domiciled, and may be served with process at 4909 Sunrise Street, Killeen, Texas 76542.  Mr. Brown may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Brown at Mr. Brown's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Brown is being sued in his individual capacity, and he acted at all relevant times under color of State law.  Mr. Brown was employed by Williamson County at all such times and acted or failed to act in the course and scope of his duties for Williamson County.  All natural person Defendants (Bradley R. Brown, Adrian D. Nira, Carlos A. Paniagua, and Ty R. Roggenkamp) in this case are collectively referred to in this complaint as the "Individual Defendants."

4.     Defendant Adrian D. Nira (sometimes referred to herein as "Mr. Nira," "Sergeant Nira," or "Medical Sergeant Nira") is a natural person who resides, is domiciled, and may be served with process at 176 S. Kelly Street, Bartlett, Texas 76511.  Mr. Nira may also be served with process wherever he may be found, or pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Nira or Mr. Nira's dwelling or

usual place of abode with someone of suitable age and discretion who resides there.  Mr. Nira is being sued in his individual capacity, and he acted at all relevant times under color of State law. Mr. Nira was employed by Williamson County at all such times and acted or failed to act in the course and scope of his duties for Williamson County.

5.      Defendant Carlos A. Paniagua (sometimes referred to herein as "Mr. Paniagua," "Jailer Paniagua," or "Sergeant Paniagua") is a natural person who resides, is domiciled, and may be served with process at 313 Turquoise Way, Jarrell, Texas 76537.  Mr. Paniagua may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Paniagua at Mr. Paniagua's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Paniagua is being sued in his individual capacity, and he acted at all relevant times under color of State law.  Mr. Paniagua was employed by Williamson County at all such times and acted or failed to act in the course and scope of his duties for Williamson County.

6.      Defendant Ty R. Roggenkamp (sometimes referred to herein as "Mr. Roggenkamp," "Jailer Roggenkamp," or "Field Training Officer Roggenkamp") is a natural person who resides, is domiciled, and may be served with process at 16760 Ronald W. Reagan Blvd., Apartment 2118, Leander, Texas 78641.  Mr. Roggenkamp may also be served with process wherever he may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Mr. Roggenkamp at Mr. Roggenkamp's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Mr. Roggenkamp is being sued in his individual capacity, and he acted at all relevant times under color of State law.  Mr. Roggenkamp was employed by Williamson County at all such times and acted or failed to act in the course and scope of his duties for Williamson County.

### B.      Jurisdiction and Venue

7.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights.  This suit arises under the United States Constitution and the following federal statutes: 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

8.      The court has personal jurisdiction over Williamson County because it is a Texas county.  The court has personal jurisdiction over the natural person Defendants because they reside and are domiciled in, and are citizens of, Texas.

9.      Venue is proper in the Austin Division of the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Williamson County, which is in the Austin division of the United States District Court for the Western District of Texas.

## II.      Factual Allegations

### A.      Introduction

10.      Plaintiff provides in the factual allegations sections below the general substance of certain factual allegations.  Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiff intends that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiff's allegations, and further demonstrate that Plaintiff's claim(s) have facial plausibility.  Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

B.      Daniel Lee Charles McCoy

11.      Daniel was born in 1993 in Temple, Texas.  He enjoyed landscaping, fishing, and playing videos.  He also liked to spend time with family.  Daniel was only 24 years old at the time of his unfortunate and unnecessary death.

C.      Daniel's Incarceration and Death in the Williamson County Jail

1.      Daniel's Psychiatric Condition

12.      Bluebonnet Trails Community Services records, regarding psychiatric examinations of Daniel, show that Daniel had significant psychiatric and mental health issues. These issues are further demonstrated by Daniel's actions in the jail, described in sections of this complaint below.  Bluebonnet Trials Community Services provided psychiatric evaluations of Daniel, upon information and belief, in connection with and/or as a result of his incarceration in the Williamson County jail.  Therefore, Williamson County was fully aware of the results of evaluations of Daniel and his psychiatric condition.

13.      Bluebonnet Trials Community Services records indicate that Daniel's mood was at times anxious, angry, and irritable.  He had poor concentration, poor attention span, and was distractible.  He was evasive and distant and would have poor eye contact with the mental health professional.  Daniel had a diagnosis of schizophrenia.  In fact, Daniel had been found to be incompetent by a psychologist and thus could not be tried for an alleged criminal offense.

14.      These records, of which, upon information and belief, one or more Individual Defendants were aware, and of which Williamson County was aware, indicate that Daniel was on a waiting list to go to North Texas State Hospital in Vernon, Texas.  Records also indicate that, as of April 3, 2018, a bed would not be available in that hospital for another eight (8) months.  Thus, Williamson County chose to continue to incarcerate Daniel in essentially in a metal box, knowing

that he had severe psychiatric issues and needed treatment at a different facility.  Williamson County's decision not to move Daniel to an appropriate facility, due to its policy, practice, and/or custom of deliberate indifference and objective unreasonableness, and/or due to lack of funding, did not excuse Williamson County's obligation to comply with the United States Constitution, the Americans with Disabilities Act, and the Rehabilitation Act.  Williamson County was also not excused from its obligation to comply with the United States Constitution, and other federal statues referenced above, simply because a single psychiatric facility would not have a bed available for Daniel for many months.  Williamson County had to take action, as it was obligated to do pursuant to federal law, even if that meant expending funds to place Daniel into a private facility or another governmental facility (including but not limited to that referenced in the order by the judge of the 277th District Court in Williamson County (referenced below).

15.     The mental health professional drafting notes regarding Daniel in the Bluebonnet Trails records included a note regarding Daniel on April 13, 2018.  The note reflects information inconsistent with what was represented by some jailers and which is detailed elsewhere in this complaint.  The mental health professional wrote that medical officers had been called to Daniel's cell "due to him vomiting (a lot)."  The note also says that they arrived to find vomit around Daniel.  Moreover, the mental health worker was told that Daniel had been "sleeping hard, [and] did not want to wake up."  Daniel was not "sleeping hard."  He was in the last few hours of his life absent emergency medical treatment.  Daniel could not stand on his own, sit on his own, and/or communicate using even a single word.  Daniel was deathly ill and was not simply sleeping.  All Defendants possessed this information.

16.     Months before Daniel's ultimate demise, a judge of the 277th District Court in Williamson County signed Order of Incompetency to Stand Trial: Restoration Commitment.  The

judge found that Daniel was incompetent, that he did not have the sufficient present ability to consult with his attorney with a reasonable degree of rational understanding, and did not have a rational and/or factual understanding of the proceedings against him.  The court further found that Daniel was incompetent to stand trial.  The court therefore "ordered, adjudged, and decreed" that Daniel was "committed and confined in the maximum security unit of Austin State Hospital or any other facility designated by the Department of State Health Services (DSHS), for a period not to exceed 120 days from the date of his admission or until he may sooner be discharged as provided by law."  The Sheriff of Williamson County was also ordered to take Daniel into custody and to deliver him to such facility.  Instead, upon information and belief, the Sheriff of Williamson County simply continued to incarcerate Daniel for a period of months up to and including April 13, 2018.  Thus, the Sheriff of Williamson County, upon information and belief, and thus Williamson County itself (since the Sheriff would be Williamson County's chief policymaker regarding such an issue) decided to simply incarcerate Daniel in the County jail to punish him and violate the court's order.  This is inexcusable, a violation of federal law, and a violation of the order of a district judge in Williamson County.  Daniel suffered mentally and physically, and ultimately with his own death, as a result.

17.     Williamson County jail records clearly demonstrate that Williamson County, including specific Williamson County employees, including, upon information and belief, the Individual Defendants, were aware for months of Daniel's severe psychiatric condition.  Daniel was a mentally tortured young man.

18.     One incident report, made by Jailer Ariel Heinrich on October 10, 2017, indicated that when Jailer Heinrich made a jail check, the jailer heard Daniel say, "Tell them to stop."  When asked who should stop, Daniel stated "the demons."  The jailer asked if the demons were telling

Daniel to hurt others, and Daniel stated, "Yes."  Further, when Daniel was asked if the demons were telling him to hurt himself, he said, "Yes."  Daniel was then put into a suicide smock as a result.

19.     On October 10, 2017, Daniel was put into a restraint chair.  Jailer William Rigney was advised by an inmate trustee that Daniel was biting cell walls and a cell door.  The jailer told Daniel to stop, or he could get sick or swallow the foam from the cell padding.  Daniel just laughed and began to pace the cell.  The trustee indicated that Daniel had apparently eaten some of the foam.  Daniel was punished by being put into a restraint chair.

20.     On October 13, 2017, Jailer Ronald Barnett observed Daniel banging his head against his infirmary cell door.  Jailer Barnett also indicated that Daniel had been doing so earlier.  Daniel was also observed again on October 15, 2017 banging his head against the cell wall.

21.     On October 27, 2017, Daniel was observed banging his head into the toilet in his cell.  On October 30, 2017, Daniel ignored all officer directives.  Daniel refused to stand up and did not verbalize any coherent response to any officer instruction.  Instead, he just stared into a corner of his cell.  The reporting officer, Dwayne Williams, indicated that Daniel had a "possible altered mental state."

22.     On November 24, 2017, Jailer Brian Hoffman was an officer on duty in the infirmary.  Daniel had been screaming in his cell off and on during Officer Hoffman's shift.  Daniel's screaming escalated to the point that he punched the wall of his cell.  Daniel was placed into a restraint chair as a result.  On November 27, 2017, Daniel was punching his cell door with a closed fist.

23.     On December 27, 2017, Daniel was once again banging his head on a cell wall.  On December 30, 2017, Daniel was yelling, "My father Kronos will smash you all!"  Upon

information and belief, Daniel was referring to a Greek god.  This was further demonstration of Daniel's psychotic behavior.

24.     On January 23, 2018, Daniel was observed eating a Styrofoam cup.  On January 31, 2018, demonstrating additional self-harm, Daniel was choking himself.  When asked to stop, he refused.

25.     On February 17, 2018, Daniel exhibited bizarre behavior.  He stood naked at the door of his cell and made vulgar sexual comments to Officer Jeremy Casey.  Upon information and belief, all Defendants in this case, and many other employees of Williamson County, were fully aware of Daniel's bizarre, psychotic behavior, over several months.  They knew that he should not be incarcerated in the jail but instead should have been transferred to an appropriate mental health facility.  Nevertheless, they continued to house Daniel in a cell which was essentially a metal box, with a single window.   This increased Daniel's anxiety, anti-social behavior, psychotic episodes, and mental anguish and emotional distress.

### 2.     Daniel's Horrific Suffering and Unnecessary Death

26.     Daniel suffered a completely unnecessary and horrific death in the Williamson County jail.  Individual Defendants' deliberate indifference, and objective unreasonableness in their actions and inaction, caused, was a proximate cause, and was a producing cause of Daniel's death.   Investigation reports following his death, and statements of people with personal knowledge of what occurred, provide a picture of Daniel's horrific last few hours.  Daniel was finally taken to a hospital early on the morning of April 13, 2018.  Unfortunately, it was too late for Daniel.  Individual Defendants should have acted long before the time he was discovered. Daniel died on April 18, 2018.

a.      Williamson County Investigation Report

27.      Williamson County Detective Klier was contacted at approximately 4:30 a.m. on April 13, 2018 by Sergeant Braeutigam, with Williamson County, and informed that the jail was investigating an unresponsive inmate.  Detective Klier was the on-call detective for the Criminal Investigations Division of the Williamson County Sheriff's Office.

28.      Detective Klier arrived at the scene of the incident involving Daniel and spoke with Lieutenant Williams.  Detective Klier noted the smell of vomit and urine when he entered Cell 8.

29.      Detective Klier spoke with Officer Roggenkamp outside of Cell 7.   Officer Roggenkamp told Detective Klier that there was a constant-watch trustee sitting outside of Daniel's cell.  He said that the trustee that night was King McCoy.

30.      Detective Klier spoke with Sergeant Cline and asked about getting video of the incident.  Sergeant Cline said that he could obtain the video, and Detective Klier told Sergeant Cline that he needed video from the time of the incident and back to a time 48 hours before.

31.      Detective Klier also learned what was, upon information and belief, a policy, practice, and/or custom of the Williamson County jail related to observation and employee logs. Detective Klier interviewed Corrections Officer Curtin.  Officer Curtin said that he was in day 5 of his training, and that he had worked 3rd South before.  He said that he had graduated from a police academy in 2011 and had been a reserve officer with the Nolanville Police Department for approximately six months.  He stated that the only medical training he had ever received was that provided in the police academy.

32.      Officer Curtin stated that he and Field Training Officer Roggenkamp racked up inmates at 11:00 p.m. (on April 12, 2018).  He said that he went on a break right after that.  He also stated that he had little or no contact with Daniel.  Detective Klier asked Officer Curtin why

his employee number did not appear in any of the logs for "Guardian."  Officer Curtin explained

that he is not in the Williamson County jail system.  He further explained that Field Training

Officer Roggenkamp logged in for Officer Curtin using Field Training Officer Roggenkamp's

number.  Thus, Officer Roggenkamp was falsifying governmental records.

33.     Detective Klier also interviewed Sergeant Paniagua.  Sergeant Paniagua admitted

that he had responded to the initial medical request regarding Daniel.  Sergeant Paniagua described

Daniel as "violently throwing up."  He moreover said that Daniel was "just lying there."  Sergeant

Paniagua also told Detective Klier that "there was vomit everywhere."

34.     Sergeant Paniagua admitted additional information regarding moving Daniel to

Cell C14R-7.  He said that as soon as Daniel sat down in the new cell, he slid to the floor and was

not moving.  Obviously, all reasonable jailers in Officer Paniagua's position and in the position of

the other Individual Defendants would have had Daniel removed from the jail and taken to the

emergency room of a local hospital.  Instead, the Individual Defendants left an inmate in charge

of watching Daniel die, alone and in an isolated cell.  Sergeant Paniagua also said that Daniel never

vocalized any words, and Sergeant Paniagua said that he could not recall if Daniel's head was up

or down when he was being moved.  Upon information and belief, Daniel's head was down due to

his long-lasting, deathly illness.

35.     Detective Klier asked Sergeant Paniagua why a call was not made to move Daniel

to medical.  Sergeant Paniagua responded, "I am a 4-month sergeant, and he is a 10-year sergeant."

Regardless of Sergeant Paniagua's reference to rank in the jail, it did not excuse his duty to comply

with the United States Constitution and obtain for Daniel emergency medical care.  He and any

other Individual Defendants could have simply called 911 and asked for such care.  Field Training

Officer Roggenkamp chose to go on break, according to Sergeant Paniagua.

36.     Sergeant Cline came to Detective Klier's office in CID and provided a black hard drive which had on it what was described as the video of the incident and the prior 48 hours. However, Sergeant Cline stated that the recording "came out a bit odd." He said that it was in 20-minute groups, but was supposedly "all there." A report indicates that Detective Klier reviewed video provided by Sergeant Cline on April 13, 2018. Detective Klier wrote that the video was difficult to search to find the start and stop for each clip. He also wrote that the video was of little evidentiary value.

37.     On Wednesday, April 18, 2018, while conducting a witness interview, Detective Klier and Detective Lawrence were informed by Medical Officer Banks that the suctioning equipment used during the medical back-up incident was not working properly. Officer Banks said that she started using one of the machines, when it appeared not to function properly. She stated that she then grabbed another suction unit and attempted to use it, and it began to malfunction also. When asked whether the units were charged, she stated that she "guessed not."

38.     Detective Klier went to medical to check the suction units. Officer Banks went with him. Medical Officer Banks said that they checked the units once each week – on Wednesdays. Detective Klier asked for a log sheet. The log sheet showed that the last day that the units were checked was September 11, 2017. Detective Klier was then advised that medical personnel do the checks, but they do not necessarily log them on the sheets. Upon information and belief, this was untrue.

### b.     Texas Rangers Report

39.     The Texas Rangers investigated Daniel's death. The lead investigator was Gary Phillips. The typical purpose of a Texas Rangers investigation regarding a custodial death, such as Daniel's, is to determine whether there was any criminal responsibility for what occurred. Texas

Rangers do not determine whether there is civil liability, such as that alleged in this case. Texas Ranger Gary Phillips submitted his investigation materials to the Williamson County District Attorney's Office, which in turn submitted to grand jury for a review.

40.     On June 25, 2018, Ranger Phillips reviewed witness statements of inmates housed in 3rd South of the Williamson County jail. Ranger Phillips wrote, "The constant theme among witnesses is that D. McCoy was not mentally stable and this was evidenced by witness statements reporting that D. McCoy was eating his own excrement, drinking of his own bodily fluids, and eating scum and bacteria from the toilet located in his cell." Upon information and belief, the Individual Defendants, Williamson County, and other employees of Williamson County knew this information days and weeks before Daniel's death, and further had an opportunity to have Daniel removed from the facility to obtain appropriate treatment.

<u>c.     Georgetown Fire Department (EMS) Records</u>

41.     Information in this portion of the complaint was obtained from EMS records. Emergency medical services personnel, employed by the Georgetown Fire Department, responded to the jail to attempt to assist Daniel. EMS personnel received the emergency call at approximately 3:02 a.m. on April 13, 2018. EMS personnel were dispatched less than one minute later, and in-route at approximately 3:05 a.m. They arrived at the jail at approximately 3:11 a.m., and moreover arrived at Daniel's side at approximately 3:14 a.m. EMS personnel ultimately left the scene at approximately 3:45 a.m. and transported Daniel to Ascension Seton Williamson Hospital. The speed with which EMS personnel arrived at Daniel's side, and their quick treatment of him and transport to a local hospital emergency room, demonstrated what could have occurred if the Individual Defendants had acted earlier and chosen to save Daniel's life.

42.     Daniel's Glasgow Coma Score was only 12, when it should be 15 for a person acting normally and who is alert to time, place, and manner.  Daniel's pain level was listed as being "10."  Medical records also indicate that he was cold and pale, with drainage from his head/face.  Daniel had abnormal pulses in his arms and legs.  EMS personnel noted that one or more jail staff were performing CPR and ventilations at the time EMS personnel arrived at Daniel's side.

### d.     Ascension Seton Williamson Hospital

43.     Williamson County Sheriff's Office Investigator Chad Skaggs spoke with medical providers at the hospital to which Daniel was taken after being found in his cell.  Investigator Skaggs spoke with Lacy Eynon.  Ms. Eynon advised that Daniel was on life support, and medical personnel were in the process of cooling down his body.  She explained that they put Daniel into a coma and were going to cool his body down for approximately 24 hours.  She said that they would start to warm Daniel back up, slowly, over approximately 18 hours.  At that time, they would reexamine him to determine if he had any neurological function.  Ms. Eynon confirmed that the hospital had lab results for Daniel.

44.     Investigator Skaggs also spoke with a Said Soubra.  Healthcare Provider Soubra said that Daniel's eyes were fixed and dilated.  He said this was not a good sign.  Investigator Skaggs examined Daniel's entire body.  He noted a couple of abrasions on Daniel's left forearm.  He did not observe any defensive wounds on Daniel's hands, but he did observe an orange color at the end of his fingernails.  He was later told that Daniel had simply been peeling and eating oranges.

45.     Medical records indicate that, at 4:54 a.m. on April 13, 2018, Daniel was examined by Dr. Julie Wachtel in the emergency department of Ascension Seton Williamson Hospital.  Daniel was not responding to any stimuli.  His Glasgow Coma Scale score was 3T, and x-ray of

his chest showed diffuse airspace disease due to aspiration.  Lab studies indicated that Daniel had an elevated level of white blood cells.  Daniel also had decreased oxygen saturation.  Daniel was diagnosed with aspiration pneumonia, cardiac arrest, hyponatremia, respiratory failure, hyperglycemia, anemia, and respiratory acidosis.  This was further demonstration that the Individual Defendants, as well as other Williamson County employees, could have acted hours before, as well as days before, to save Daniel's life.  Daniel had an illness that had lasted for a significant period of time.

46.     Daniel was provided medical treatment and evaluation for several days.  On April 18, 2018, Daniel remained unresponsive.  Daniel passed away at 6:31 p.m. on April 18, 2018.

### e.     Daniel's Death

47.     A Williamson County investigation report indicates that Daniel was removed from life support at 6:11 p.m. on April 18, 2018.  Investigator Lawrence observed Daniel's body and did not note any obvious external injuries.  He observed the names of seven of Daniel's family members, and phone numbers, listed on the hospital wall.

### f.     Witness Statements

### (1)     Banks, Jordan – Medical Officer

48.     Medical Officer Jordan Banks provided a written statement indicating that she was on duty in the medical department at the Williamson County jail on April 13, 2018.  Her statement indicates that, at approximately 2:59 a.m., a medical back-up was called to C14R-07.  Officer Banks, Officer Busby, and Medical Sergeant Nira responded with a gurney to the south side elevator.  Sergeant Nira instructed Officer Banks and Officer Busby to run ahead of the cart and make contact with Daniel.  Officer Banks entered the cell first, at approximately 3:01 a.m., and found Daniel.  Daniel was on his right side.  Officer Banks wrote that Daniel had foaming blood-

tinged sputum flowing from his mouth and both nostrils. Medical Officer Banks checked for a pulse and found it to be thready and weak.

49.     Officer Banks instructed Jailer Roggenkamp and Jailer Brown to call EMS. Officer Banks was at Daniel's head running airway control. She grabbed gauze and wiped away the secretions from Daniel's face. She then began to suction Daniel's airway using a catheter. She instructed officers to "log roll" Mr. McCoy onto his back. Daniel's pupils were dilated and non-reactive to light.

50.     Sergeant Nira continued compressions until an AED instructed them to clear the patient. Since no shock was advised, Sergeant Nira continued compressions. Officer Banks cleared Daniel's airway and placed an airway into Daniel's mouth to suppress his tongue. She then placed a mask onto Daniel's face and attempted a c-clamp hold to bag Daniel. However, because Daniel's face was "covered in secretions," it was difficult to make the seal.

51.     Detective Klier and Investigator Lawrence interviewed Medical Officer Banks, in Interview Room Number 1, on April 18, 2018. Medical Officer Banks (#14267) stated that she had arrived at the jail at approximately 2:53 a.m. on April 13, 2018. She recalled that Officer Morales, Sergeant Nira, and Medical Officer Busby entered an elevator to respond to 3rd South, to Daniel's medical emergency. She noticed, when reaching Daniel, that his skin had a bluish-grey tint. She also saw that sputum was coming from his mouth. She located a weak pulse. She also noted saliva and a red tinge coming from Daniel's mouth. She further stated that, during the first two rounds of CPR compressions, she had to continue suction due to the amount of fluid coming from Daniel. Upon information and belief, this was further evidence that Daniel had been visibly deathly ill for several days.

52.     Medical Officer Banks stated that there was no way that Daniel's airway was open. She also said that the suction machines were not working properly.

53.     Medical Officer Banks said that, during CPR, Sergeant Nira asked for someone to record the incident.  However, she never saw a camera being used to record the incident.  Further, interestingly, and contrary to Sergeant Nira's write-up of two fellow jail officers, Medical Officer Banks said that there was not a direct order, to a specific person, to get a camera.

54.     Medical Officer Banks said that she felt like she needed to tell the investigators about a Facebook conversation that occurred between medical personnel.  She said that the messages were demeaning and "messed up."  Detective Klier asked Medical Officer Banks if she would provide the investigators with copies of the messages, and she stated that she would.  The case supplemental report, from which this information was obtained, reads that Detective Klier's report has further details referencing the Facebook messages.  Upon information and belief, the messages will provide evidence supporting that Daniel was discriminated against in a manner that violated the Americans with Disabilities Act and/or the Rehabilitation Act.  Upon information and belief, the messages will further indicate the deliberate indifference and objective unreasonableness of one or more Individual Defendants.

<u>(2)     Berkley, Treydon – Inmate</u>

55.     Investigator Chad Skaggs interviewed Treydon Berkley, an inmate in the Williamson County jail.  Mr. Berkley said that he had been in the Williamson County jail for two weeks.  Mr. Berkley also said that Daniel was already on 3rd South when Mr. Berkley arrived at the jail.  Mr. Berkley said that he had seen Daniel eat things from inside of his toilet.  He further said that he was able to see this, because Daniel would come to the window of his cell and eat it. Thus, upon information and belief, the Individual Defendants either saw Daniel eat things from

his cell toilet or heard about him doing so long before his death.  Mr. Berkley also stated that Daniel had been vomiting for the past week.

(3)      <u>Brown, Bradley R. – Jailer</u>

56.     Officer Brown's written statement indicates that he was working at the Williamson County jail on April 12, 2018, "on the 3rd South on little C side."  When Officer Brown was returning from a break, Officer Roggenkamp asked where he was.  Officer Roggenkamp and Sergeant Paniagua notified Officer Brown that he needed to meet them at Daniel's cell.

57.     When Officer Brown arrived at Daniel's cell, he noticed that Daniel was lying on the cell floor next to the cell door.  He also noted that Daniel was "very pale in the face."  Officer Brown could see that Daniel "had thrown up in his cell along with throwing up on his blanket." Sergeant Paniagua instructed Mr. McCoy to sit up, so that he could put handcuffs on him.  Daniel complied.  After Sergeant Paniagua put handcuffs on Daniel, he helped Daniel to his feet.  After Daniel was on his feet, Officer Brown took over holding Daniel so that Daniel could remain on his feet.  Upon information and belief, Daniel could not stand on his own.  Sergeant Nira then stepped around Officer Brown to see what Daniel was throwing up.

58.     Officer Brown noted that Daniel was "very unsteady on his feet and having a hard time standing on his own."  Daniel then just lost ability to stand, and Officer Brown had to guide him to the floor slowly, so he would not hurt his legs or knees on the cell floor.  Officer Brown, and upon information and belief other natural person Defendants, observed this.

59.     Daniel was then on his knees on the floor, and he started throwing up again while Officer Brown was holding him.  Officer Brown "was holding [Daniel] at a strange and off-balanced position."  Officer Brown then asked Officer Roggenkamp to take over, since Daniel was still handcuffed.  Officer Brown was concerned that Daniel would fall onto his face.  Daniel was

then helped to his feet, and Officer Brown and Officer Roggenkamp moved Daniel into a cell next door.

60.    Officer Roggenkamp stated that he thought Daniel was drunk.  However, upon information and belief, it was clearly apparent that Daniel was not drunk but instead seriously ill needing medical treatment.  Officer Brown then left the scene to conduct his rounds and watches. Officer Brown should have instead contacted EMS personnel to have Daniel removed from the jail and taken to a local hospital emergency room.  If he had done so, Daniel would have received needed life-saving medical treatment, and would have lived.

61.    According to Officer Brown, a few hours later, Officer Roggenkamp asked over the radio for medical back-up.  Officer Brown responded and saw Officer Roggenkamp with Daniel.  Daniel was on his side with white and red colored foam coming out of his mouth.  They left Daniel on his side due to "all of the foam com[ing] out of his mouth."

62.    Notes of the same interview with Officer Brown, or a different interview with Officer Brown, indicate that, when Daniel was moved from Cell 8 to Cell 7, so that Cell 8 could be cleaned, Daniel fell over when he sat on the stool.  Daniel was then placed onto a mattress in Cell 7.  He also said that, when he arrived at Cell 7 some time between 2:55 a.m. and 3:00 a.m., he observed foam, vomit, and blood in the cell.  He said it reminded him of someone who had overdosed.

### (4)    Busby, Jakeb – Medical Officer

63.    Medical Officer Jakeb Busby provided a written statement indicating that he was on duty in the Williamson County jail medical department on April 13, 2018.  A medical back-up for Daniel was called to 3rd South, according to Officer Busby's statement, at 3:00 a.m.  Officer Busby, Officer Banks, and Medical Sergeant Nira responded to the call.  Medical Officer Banks

and Medical Officer Busby ran ahead of all responding officers to evaluate the scene. When they entered the cell, Daniel was lying on his right side on top of a mattress on the floor. Pink-colored sputum was flowing from his mouth and both nostrils.

64.     Medical Officer Banks checked for a pulse, and she stated that it was weak and that an airway bag would be needed. Medical Officer Busby left the room and ran back to a door and met Sergeant Nira.

65.     At 3:02 a.m., Medical Officer Banks did what the individual Defendants should have done hours before – called for EMS. Medical Officer Banks began to suction Daniel's airway. Emergency medical treatment was provided. The Georgetown Fire Department arrived, according to Officer Busby's statement, at 3:10 a.m. Georgetown EMS waited for Sergeant Nira to finish compressions, and Daniel had pulses. Georgetown Fire Department EMS completed multiple rounds of CPR, and they intubated Daniel. Daniel, with pulses present, was placed on a backboard and then lifted onto a stretcher sitting outside of the cell room door.

### (5)     Carrasquillo-Morales, Christian – Inmate

66.     Investigator Skaggs also interviewed inmate Christian Carrasquillo-Morales. Mr. Carrasquilo-Morales said that he had been a constant-watch trustee in the Williamson County jail, and that he had been a trustee for the prior two weeks. Mr. Carrasquillo-Morales said that he normally worked the 4:00 p.m. to midnight shift. Investigator Skaggs asked how many times he had watched Daniel. He said that he had watched Daniel approximately four-to-five times. Investigator Skaggs asked whether he ever noticed Daniel doing anything when he watched him. Mr. Carrasquillo-Morales stated that the week prior, he saw Daniel grab things out of the toilet and eat them. He also saw Daniel suck on them. He further noticed that Daniel was red around his eyes, and his nose was red and puffy.

67.     Mr. Carrasquillo-Morales said that he had observed Daniel grab stuff out of the toilet on Tuesday or Wednesday.  This would have been on April 10, 2018 or April 11, 2018.

68.     Investigator Skaggs asked whether he saw Daniel doing anything during the shift before he died.  He said that Daniel was singing and walking around in circles.  Upon information and belief, Daniel was not acting in as active a manner as such words imply.  Mr. Carrasquilo-Morales also said that Daniel started vomiting toward the end of his shift.  He also said that Daniel was still vomiting when he was relieved by the new constant-watch trustee.

<u>(6)     Chambers, Larry – Inmate</u>

69.     Detective Klier conducted an interview of inmate Larry Chambers on April 16, 2018 at 10:00 a.m.  Upon information and belief, Mr. Chambers was in cell C14L-5.  Mr. Chambers initially said that he did not have first-hand knowledge of the incident.  Detective Klier then told him that he had been told by others that Mr. Chambers was shouting out instructions to the corrections officers that Daniel had to be moved, or he would die.  He then admitted that he was talking to staff, and that he did not think Daniel's situation was a good situation.  Detective Klier asked Mr. Chambers if he had medical training, and Mr. Chambers said that he had Triple Canopy prior to an Iraq tour.  Upon information and belief, Mr. Chambers was a veteran.

70.     Mr. Chambers told Detective Klier what everyone else at the jail knew, including the Individual Defendants and other employees of the Williamson County jail – Daniel was mentally ill.  Moreover, everyone knew that Daniel would eat out of the toilet in his cell.  He also said what, upon information and belief, all Individual Defendants and other employees of Williamson County knew – Daniel was loud and would make sounds like he was vomiting a lot.

(7)     Cole, Rae – Field Training Officer

71.     Field Training Officer Rae Cole provided a written statement.   Officer Cole responded to a back-up call at approximately 3:05 a.m. on April 13, 2018.  Officer Cole reached Daniel's housing unit and "observed a red foamy-like substance, a green mattress, and inmate McCoy's body."   Officer Cole noted that other personnel in the cell included Medical Officer Jordan Banks, Medical Officer Jakob Busby, Field Training Officer Ty Roggenkamp, and Officer Bradley Brown.

(8)     Lewis, Jeremy – Inmate

72.     After incidents leading to Daniel's death, Investigator Chad Skaggs interviewed inmate Jeremy Lewis.  Mr. Lewis indicated that he had been in the Williamson County jail since October 12, 2017.  Investigator Skaggs asked how long Daniel had been on 3rd South, and he said that Daniel had been there for approximately three weeks.  He also said that the whole time Daniel was on 3rd South, he had been vomiting.  Mr. Lewis also said that the prior week, everyone in that area could smell what they thought was feces in his cell.  He also stated that he had heard that Daniel would eat his own feces.

73.     Mr. Lewis also said that, before the incident referenced above, at approximately 8:15 p.m. on April 12, 2018, Daniel started vomiting and making a moaning noise.  Mr. Lewis's recollection was that medical came up and started CPR at approximately 2:30 a.m. on April 13, 2018.

(9)     McCoy, King Michael – Inmate

74.     Investigator Skaggs also interviewed inmate King Michael McCoy.  Mr. McCoy stated that he had been a trustee in the Williamson County jail since February 2018.  Mr. McCoy,

as other trustees, were impermissibly used by Williamson County to staff an understaffed jail and to save money.  The result was constitutional violations asserted in this case.

75.     Mr. McCoy said that he worked the midnight to 8:00 a.m. shift.  He also said that he had watched Daniel approximately twenty to twenty-five times.  Mr. McCoy said that the night of the incident referenced in this pleading leading to Daniel's death was the first night that he had watched Daniel on 3rd South.  Therefore, upon information and belief, Mr. McCoy had not watched Daniel in the approximate two week period prior to Daniel's death.

76.     Mr. McCoy stated that he usually watched Daniel downstairs in the infirmary. Upon information and belief, this is evidence that the Individual Defendants, as well as other Williamson County employees, were aware of Daniel's serious illness and decided to do nothing other than drop him into an isolated cell to die.  When asked whether he had observed Daniel do anything out of the ordinary, Mr. McCoy stated that he had seen Daniel urinate in a cup and drink it.  He had also seen Daniel ejaculate into a cup and drink it.  He had further seen Daniel eat Styrofoam and put Styrofoam into his rectum and then eat it.  Mr. McCoy also said that he had seen Daniel eat his own feces as well as other things from off of the floor and out of the toilet. Upon information and belief, the Individual Defendants, and other Williamson County employees, were fully aware of this bizarre behavior by either personally observing it or hearing about it. There is no doubt, and there was no doubt to Individual Defendants and other Williamson County jail employees, that Daniel was seriously physically and mentally ill.

77.     Investigator Skaggs asked Mr. McCoy what happened after Daniel was moved from the cell that was covered with vomit.  Mr. McCoy said that the "bean hole" was left open so that he could check on Daniel.  A "bean hole" is a slot in a cell door allowing the passage of food from outside the cell to inside the cell.  Upon information and belief, this policy, practice, and/or custom

of Williamson County in allowing a trustee to use merely a "bean hole" to "check" on inmates who needed emergency medical treatment was a cause, a proximate cause, and/or a producing cause of all damages asserted in this pleading.  Mr. McCoy said that he could hear what sounded like snoring from Daniel's cell.  He also heard at one time what sounded like gasping noises coming from Daniel and saw his legs moving.  Upon information and belief, inmate McCoy was not sufficiently watching Daniel but instead would just listen to him occasionally and possibly on occasion look through the bean hole.  He noticed at the roughly 3:00 a.m. time when Daniel was found, when Daniel was rolled over, that there was blood and mucus all over his face and mouth.  Once jail staff entered the cell, he was told to go to the end of the cell area.

78.     Records obtained from Williamson County indicate that Mr. McCoy may have been interviewed on more than one occasion.  In potentially another interview, Mr. McCoy stated that, on April 13, 2018, at 12:15 a.m., he took over watching Daniel.  He was advised that Daniel had been vomiting.  He said that Officer Roggenkamp opened the "bean shoot" and they both observed vomit in Daniel's initial cell.  A "bean shoot" is the same thing as the "bean hole."  Mr. McCoy stated that he asked Daniel whether he was okay, and Daniel moaned.  He further stated that Daniel was lying on a mattress on his back in front of the door.

79.     Mr. McCoy stated that Officer Roggenkamp left for a few minutes and then returned with Sergeant Paniagua, Officer Brown, and Officer Curtin.  Mr. McCoy stated that Officer Roggenkamp and Officer Brown went into Daniel's cell and moved him from that cell to another cell.  Mr. McCoy said that Daniel was incoherent when being moved.  Further, Mr. McCoy stated that when they moved Daniel to another cell, which was Cell 7, he sat on a stool and fell over.  Mr. McCoy said that Daniel was left lying on a mattress in Cell 7, face down.  Upon information and belief, this resulted in Daniel's death.  Further, upon information and belief, all

Individual Defendants were aware that Daniel was left face down on a mattress in Cell 7. Daniel had been moved from Cell 8.

80.     Officer Roggenkamp then returned and began to clean Cell 8. Mr. McCoy stated that while he was watching Daniel, Daniel began to make a choking sound. Mr. McCoy said that he "went and notified Officer Roggenkamp." He said that when Officer Roggenkamp rolled Daniel over, there was a pool of blood and brown substance on Daniel's face. Mr. McCoy stated that, during his watch of Daniel, Daniel was never conscious and able to speak with Mr. McCoy.

### (10)     Nira, Adrian D. – Sergeant/Medical Officer

81.     Sergeant Nira was also interviewed by Investigator Lawrence in connection with Daniel's death. Sergeant Nira stated that, at midnight, he was called by Officer Roggenkamp regarding Daniel vomiting. He said that when he arrived at 3rd South C Block, he was told that Daniel had been vomiting. He said that he then looked through the "bean shoot" into Daniel's cell and was able to see that Daniel had vomited. Sergeant Nira stated that Daniel appeared to be lethargic but was able to track him with his eyes when he asked questions. Upon information and belief, this was false.

82.     Sergeant Nira said that Daniel was lying on a mattress on his right side in front of the cell door. He said that he asked Daniel if he was okay. Daniel did not verbalize a response but simply mumbled. Sergeant Nira stated that they waited for Sergeant Paniagua and Officer Brown to arrive. Sergeant Paniagua, Officer Brown, and Officer Roggenkamp then entered the cell. Sergeant Nira stated that Daniel was restrained after they entered the cell. Sergeant Nira also said that, when Daniel sat up, he began vomiting. Daniel was then walked to Cell 7, from Cell 8, with assistance. Sergeant Nira indicated that he thought Daniel was intoxicated. Upon information and belief, this assertion was false. Sergeant Nira said that Daniel was on "constant-watch."

However, upon information and belief, as referenced elsewhere in this pleading, such a watch was by someone other than a licensed jailer – an inmate.

83.     Sergeant Nira then left the floor and returned to the medical department.  Upon information and belief, Sergeant Nira did not take any of Daniel's vital signs.  Upon information and belief, Sergeant Nira did not determine Daniel's blood pressure, did not determine Daniel's temperature, and did not determine Daniel's heart rate.  Upon information and belief, Sergeant Nira did not determine Daniel's oxygen saturation level.  Further, upon information and belief, other Individual Defendants noticed that Sergeant Nira did not conduct any common, basic medical tests.  Therefore, they were unable to rely on any analysis conducted by a purported medical officer.  Laypeople such as the other Individual Defendants knew, when Sergeant Nira failed to conduct even the most basic medical tests, of which all reasonable adult laypeople are aware, that Daniel had not been examined and/or evaluated – at all – by medical personnel.  Thus, it was unreasonable and deliberately indifferent for any such Individual Defendants to rely on any action and/or opinion of Sergeant Nira as it related to Daniel's medical condition.

84.     Sergeant Nira further said that, at approximately 3:00 a.m. he received a call from Officer Roggenkamp asking for medical back-up.  He said that he, Officer Busby, and Officer Banks responded.  Sergeant Nira stated that Officer Banks rolled Daniel to his side, and he observed foam and vomit coming from Daniel's nose.  Sergeant Nira stated that Daniel had aspirated on his own vomit.  Sergeant Nira could also hear agonal breathing.  "Agonal breathing" is a term used to describe struggling to breathe, or gasping.  It is typically a symptom of a severe medical emergency, such as a stroke or cardiac arrest.  Sometimes, gasping associated with agonal breathing is not truly breathing, but rather a brainstem reflex.

85.     Sergeant Nira provided a written statement regarding Daniel's death.  Sergeant Nira indicated that he received a call at approximately 12:30 a.m. on April 13, 2018 regarding Daniel vomiting in his cell and on himself.  The call was from Officer Roggenkamp, and Sergeant Nira was told that he wanted medical personnel to "come and evaluate" Daniel.  Sergeant Nira told Officer Roggenkamp that he or another medical officer would evaluate Daniel.

86.     At approximately 12:35 a.m., according to Sergeant Nira's statement, he arrived to evaluate Daniel.  He then indicated that he observed Daniel through the "bean slot" in Daniel's cell's door.  Sergeant noticed what appeared to be vomit on Daniel's mattress and suicide blanket.  Daniel was on suicide watch.

87.     When Officer Roggenkamp gave commands to Daniel to sit up, Daniel could only move under his suicide blanket and make grunting sounds in response.  Sergeant Nira noticed that there was vomit in several locations on the cell floor.

88.     After three officers entered the cell, without Sergeant Nira, Daniel sat up.  He then "produced more vomit, in the amount of what appeared to be a half cup to a cup."  Daniel was then assisted to a standing position to be moved from C14R-8 to C14R-7.  Medical Officer Nira did not enter Cell 8, the cell in which Daniel was originally incarcerated, upon information and belief, until after Daniel was removed from the cell.  Thus, Medical Officer Nira did not conduct any evaluation whatsoever of Daniel.  He did not take vitals, he did not do anything that even a much less than competent and reasonable healthcare provider would do.  Thus, observing officers could not rely on his alleged "medical evaluation" of Daniel.  There was no medical evaluation of Daniel.  Even non-medical laypeople would know, and all Individual Defendants other than Sergeant Nira knew, that Sergeant Nira had conducted no medical evaluation of Daniel.  Thus, they could not rely on any of Sergeant Nira's opinions or statements regarding medical issues.  If they had done

so, in light of their observation, they would be acting in a deliberately indifferent and objectively unreasonable manner.

89.     Sergeant Nira then said something about which he would later change his story when taking to Detective Klier.  Sergeant Nira said that he "observed" officers in Daniel's cell asking him questions, and Daniel giving responses with "mild slurred speech, grunts, and head nods."  Upon information and belief, Sergeant Nira was lying to protect himself from appearing to be deliberately indifferent regarding Daniel's death.

90.     Upon information and belief, Sergeant Nira continued making one or more misrepresentations in his statement.  He stated that Daniel kept falling asleep while sitting on the floor.  He also said that officers asked Daniel if all he wanted to do was go back to sleep, and that Daniel responded that he did.  This was a blatant falsehood.  Sergeant Nira then wrote that he informed officers that he was leaving the floor, leaving Daniel on a suicide watch.  Sergeant Nira then "continued [his] daily activities."

91.     Detective Klier also took a statement from Sergeant Nira.  Sergeant Nira said that Daniel had been lying on the floor on his right side with his eyes closed.  Sergeant Nira alleged that he was "evaluating" Daniel by looking through the bean shoot in the door.  The door was closed at the time.  This was not a medical evaluation that anyone with medical training, or even any layperson, would believe to be reasonable.  Sergeant Nira did not conduct any medical evaluation of Daniel.

92.     Sergeant Nira said that when Sergeant Paniagua and Officer Brown arrived, the door to Daniel's cell was open.  He said that Sergeant Paniagua, Field Training Officer Roggenkamp, and Officer Brown entered Daniel's cell.  He said that the corrections officers had to step over Daniel.  Sergeant Nira also said that, after they got Daniel to his feet, Daniel's legs

buckled, and he vomited again.  Upon information and belief, Sergeant Nira never even entered Daniel's initial cell.  Daniel was then moved to Cell 7.

93.    Sergeant Nira explained to Detective Klier that there was not the acidic smell you would expect with vomit.  He said that it was a "weird color."  This was yet another indication that Daniel needed emergency medical treatment – not to be moved to a cell to be left to die alone. Sergeant Nira said that there was not a video recording of that incident.

94.    Sergeant Nira said that he felt alright with leaving Daniel in the cell because of the constant watch.  Such an assertion is idiotic, not in compliance with any reasonable standards, and not one that any reasonable jailer or medical officer would make.  Simply watching someone that needs emergency medical treatment does nothing for that person.

95.    The fact that Defendants may have "checked on" Mr. McCoy at any point, without doing anything as a result of his clear and visibly apparent need for serious medical treatment, reminds one of a recent commercial for LifeLock.  LifeLock is a credit monitoring company that also purports to resolve and/or avoid credit issues.  In the commercial, an apparent dentist and assistant are shown examining a man in a dental chair.  The following conversation ensues:

| | |
|---|---|
| Apparent dentist: | David, you have one of the worst cavities I have ever seen.  Okay. Have a good day. |
| Patient: | Aren't you going to fix it? |
| Apparent dentist: | Oh, I'm not a dentist, I'm a dental monitor . . .  tell you when you have a bad cavity. |
| Apparent dental assistant: | It's bad.  Lunch? |
| Apparent dentist: | Oh, yes. |
| Patient: | Where are you going? |

https://www.youtube.com/watch?v=CGDzxPsdi7w

The "patient" was shocked that the purported dentist and dental assistant knew that he had a bad cavity and would do nothing about it. The purported dentist and dental assistant merely noted that the supposed patient had a serious problem.

96.    The commercial is humorous and makes the point that LifeLock goes beyond simply monitoring credit.   LifeLock actually does something about credit problems. Unfortunately, with regard to "monitoring" Daniel, there is no humor in its application. It did little good to "monitor" Mr. McCoy. Mr. McCoy did not need monitoring. He needed emergency medical treatment. If it had been provided, he would have lived. Thus, the deliberate indifference and objective unreasonableness of natural people mentioned in this pleading, regarding Daniel's known serious health issues, in addition to and combined with Williamson County's policies, practices, and/or customs, were moving forces behind and caused Daniel's unnecessary, painful death.

97.    Sergeant Nira admitted to Detective Klier that Sergeant Nira then went downstairs and watched the jail's previously-used video system. He admitted that he did not see the constant watch trustee nor the corrections officers. Sergeant Nira also admitted that he never heard Daniel say a single word during his interaction with him that night. Detective Klier challenged Sergeant Nira on the representation in this statement, in which he represented that Daniel had slurred speech. Sergeant Nira said that a corrections officer must have told Sergeant Nira that. Sergeant Nira never observed Daniel using slurred speech, or any speech at all, and he knew that he was not telling the truth when he said that he had such an observation.

98.    Detective Klier asked Sergeant Nira whether Daniel was walking when they moved him to Cell 7. Sergeant Nia said that Daniel's body was in a slight "L," and he was not waking

normally.  Sergeant Nia admitted that Daniel was not keeping pace with the correction officers and Sergeant Nira when being moved from Cell 8 to Cell 7.

99.     Detective Klier asked Sergeant Nira whether he saw Daniel fall off of the cell chair onto the floor, he said, "No."  The next to the last sentence in Detective Klier's report of Sergeant Nira's statement reads, "The look of surprise and concern seemed legitimate and he admitted that he never entered a cell with Daniel in it until the 3am [sic] incident."  This is the very definition of deliberate indifference.

100.     Moreover, other Individual Defendants who observed Sergeant Nira doing nothing to medically evaluate or treat Daniel could not rely on Sergeant Nira's opinion or instruction.  No reasonable jailer would have relied on anything Sergeant Nira said about Daniel's condition, observing that Sergeant Nira did not take Daniel's temperature, did not take Daniel's blood pressure, did not determine Daniel's oxygen saturation level, did not check Daniel's breathing, did not check Daniel's heartrate, and did not even enter the cell with Daniel.

101.     Despite Sergeant Nira's direct involvement in causing Daniel's death, he chose to write up employees for failing to record attempts to treat and/or revive Daniel after he was discovered around 3:00 a.m.  Upon information and belief, Sergeant Nira completed a corrective action form in which Officer Raeneisha Cole and Officer Justin Malandris were provided a written warning for failing to record the incident.  Sergeant Nira indicated in the form that he had instructed these two officers to locate a video camera to record the incident.  He further indicated that he later asked the officers which of them had recorded the incident, and also to identify the location of the camera.  Officer Cole indicated that she had retrieved the camera and handed it to Officer Malandris, but that neither officer had recorded the incident.  Regardless, recording the incident at a time well after that at which Sergeant Nira and other natural person Defendants could have taken

action means little regarding Daniel's death.   The occurrence does, however, provide further evidence into significant problems at the Williamson County jail.

### (11)    Paniagua, Carlos A. – Sergeant/Jailer

102.    Sergeant Carlos Paniagua's written statement indicates that, on April 13, 2018, at approximately 12:32 a.m., he was on duty as a shift supervisor at the Williamson County jail.  He learned from the "third south" portion of the jail that Daniel was throwing up "all over his cell." Sergeant Paniagua went to the south jail and met with Medical Sergeant near Daniel's cell. Daniel's cell was essentially a metal box, with four metal walls and a metal ceiling, with a single door with a small window, roughly head-level.

103.    Sergeant Paniagua observed vomit "all over Mr. McCoy's cell."  He then asked Daniel to sit up so that medical could evaluate him.  Sergeant Paniagua indicated that it appeared to him that Daniel was "heavily intoxicated."  It should go without saying that inmates in the Williamson County Jail should not be "heavily intoxicated," as there should be no alcohol or drugs available by which they could be intoxicated.  Regardless, Daniel was not intoxicated.  Sergeant Paniagua should have immediately requested an ambulance.  If he had done so, Daniel would have lived after receiving needed medical treatment in the emergency department of a local hospital.

104.    Sergeant Paniagua placed hand restraints on Daniel and helped him to his feet. Sergeant Paniagua wrote that Daniel could not stand on his own.  This is further evidence that Daniel needed emergency medical treatment, and Sergeant Paniagua, looking at Daniel, knew that Daniel needed emergency medical treatment.  Instead of calling for an ambulance, he decided to simply move Mr. McCoy to another cell.  He moved Daniel, so that Daniel's vomit-covered cell could be cleaned.  This was a death sentence for Daniel.  Moving Daniel to another cell would not result in Daniel receiving needed medical treatment but instead dying an agonizing death.

105.     Sergeant Paniagua continued in his statement.  Around 3:00 a.m., Field Training Officer Roggenkamp called for medical backup in the 3rd South portion of the jail.  However, it was too late for Daniel.  The natural person Defendants did not take immediate action previously, when their action would have saved Daniel's life.  They should have called for EMTs and had Daniel transported to a local emergency room.  If they would have done so, he would have received needed medical treatment and survived.

<u>(12)     Parks, Anthony – Inmate</u>

106.     Detective Klier interviewed inmate Anthony Parks.  Mr. Parks said that "McCoy was off."  In doing so, Mr. Parks was relating that Daniel had serious mental health issues.  Upon information and belief, all Individual Defendants were fully aware of Daniel's serious mental health issues and his need for treatment outside the jail.

107.     Mr. Parks explained that Daniel would say that he was the son of Hercules and that Daniel would say "all kinds of crazy stuff."  Mr. Parks said that Daniel started vomiting around 8:00 p.m. (on April 12, 2018).  He also said that it sounded like Daniel had been throwing up for approximately the prior ten (10) days.  Mr. Parks said that fellow inmate trustees told him that Daniel would scrape out bacteria (grey and brown stuff in the toilet) and eat it.  He was also told that Daniel would put orange peels in the toilet, then remove and eat them.  Mr. Parks was also told that Daniel drank urine.

108.     Mr. Parks said, on the night of the event culminating in Daniel's death, the "fat sergeant" (believed to be Officer Paniagua) and the new kid that was scared (believed to be Officer Curtin) came down to the cell with medical.  Mr. Parks then stated that the "medical guy did not do shit."  Mr. Parks stated that "he did not even do the thing you place on the arm."  Detective Klier asked whether he meant a blood pressure check, and Mr. Parks said "yes."  He also stated

that "medical" did not even enter the cell with Daniel.  Upon information and belief, these descriptions were about Medical Officer Nira.

109.     Inmate Parks stated that, when they moved Daniel from Cell 8 to Cell 7, he thought Daniel was dead.  Upon information and belief, his observation of Daniel's stature, and Daniel's inability to stand and/or communicate, was also observed by all Individual Defendants as well as other Wiliamson County jail employees.  Mr. Parks said that they put Daniel into the new cell and left him on his stomach.  This was deliberate indifference and objectively unreasonable.  Mr. Parks also said that other inmates were yelling to take Daniel to medical.  He then said the "fat sergeant and Roggenkamp stated that he was drunk."  Mr. Parks stated that Daniel was not drunk.  Upon information and belief, the Individual Defendants likewise knew that Daniel was not drunk.

<u>(13)     Perez, Jesus – Inmate</u>

110.     Investigator Skaggs also interviewed Jesus Perez, another inmate.  The Williamson County jail was in habit of using trustees, or other prisoners, to observe fellow prisoners.  Upon information and belief, this was done pursuant to policy, practice, and/or custom of Williamson County.  Moreover, upon information and belief, Williamson County chose to use trustees to save money and to keep from fully and appropriately staffing the Williamson County jail.  This was a decision made with deliberate indifference to the known needs of inmates and with the knowledge that, to a certainty, inmates would suffer, be ill, not receive appropriate treatment, and/or die as a result.  Mr. Perez's statement provides a perfect example of what occurs when inmates are put in charge of watching other inmates.

111.     Contrary to every other statement obtained by Investigator Skaggs related to Daniel's death, and documented in a case supplemental report reviewed to prepare this complaint, Mr. Perez had very little to say.  In fact, the sum total of notes related to Investigator Skaggs'

interview of Mr. Perez were: "I advised Jesus to why I was speaking with him and asked him if he knew what happened. Jesus told me that he is a 3rd South floor trustee and he did not see anything." Upon information and belief, Mr. Perez failed to provide what he heard and/or saw so that he would not lose trustee status. Further, upon information and belief, Mr. Perez was aware of the unusual relationship, stated at best, between a trustee and jail officers. Mr. Perez would receive special treatment for in essence acting as an uncertified and unlicensed jailer. In exchange, upon information and belief, Mr. Perez understood that he should not provide any information that would paint any of the jailers in a bad light. Further, upon information and belief, Mr. Perez knew that had he done so, his trustee status, and potentially other benefits, would emd.

### (14)    Patrick, Corey – Inmate

112.    Investigator Skaggs also interviewed inmate Corey Patrick. Mr. Patrick indicated that he had been in the Williamson County jail approximately six weeks. He also said that Daniel had been on 3rd South for approximately two weeks. He said that the week before Daniel's death people in the area could smell what they believed to be feces in Daniel's cell. Mr. Patrick said that he went to dinner on April 12, 2018 at around 7:00 p.m. He said that he later woke up and could hear Daniel vomiting. He said that he heard Daniel vomit at least three times before Daniel was moved to another cell. From Mr. Patrick's physical perspective, which is not upon information and belief as close as natural person Defendants, it looked like Daniel had been drinking.

### (15)    Roggenkamp, Ty – Field Training Officer

113.    Detective Klier also interviewed Field Training Officer ("FTO") Roggenkamp. FTO Roggenkamp said that he began working for the Williamson County Sheriff's Office in December 2013 and became an FTO in August 2017. FTO Roggenkamp said that, around 12:30 on April 13, 2018, Daniel began vomiting and was lying on the floor of C14R-8. Upon information

and belief, the assertion that Daniel began vomiting at that time is untrue. As other witnesses have said, Daniel began vomiting long before. Moreover, upon information and belief, Daniel had been vomiting over a number of days, and possibly two weeks, due to his serious illness. Further, upon information and belief, FTO Roggenkamp was aware that Daniel was seriously and deathly ill long before 12:30 a.m. on April 13, 2018.

114.    The fact that FTO Roggenkamp knew that Daniel was ill was evidenced by him calling to medical in the jail to have a medic look at Daniel. FTO Roggenkamp would not have asked for a medic to look at Daniel if he did not believe that Daniel was ill. As relayed elsewhere in this complaint, Medical Sergeant Nira came to the cell but conducted not even one single basic medical test. Sergeant Nira did not take Daniel's blood pressure, did not check Daniel's respiration, did not take Daniel's temperature, did not determine Daniel's oxygen saturation level, and did not check Daniel's heart beat. Upon information and beief, FTO Roggenkamp was aware that Medical Sergeant Nira conducted no medical tests at all.

115.    Further, in addition to knowledge gained as any adult layperson would have gained at that point, regarding such basic medical tests, FTO Roggenkamp learned through his years of service in a jail environment that such tests would have to be done for a simple, basic medical evaluation. Therefore, FTO Roggenkamp being aware that no such tests were done at all removed his ability to rely on anything Medical Sergeant Nira said regarding Daniel's condition. There was no medical evaluation upon which FTO Roggenkamp could reasonably rely.

116.    FTO Roggenkamp confirmed what others have said – Daniel slid to the floor after being placed on a stool in the cell to which he was moved (C14-7). FTO Roggenkamp also stated that Daniel was unable to hold himself up.

117.     Shortly after 3:00 a.m. on April 13, 2018, FTO Roggenkamp went to Cell 7 to check on Daniel after being alerted by Jailer Curtin.  FTO Roggenkamp said that Daniel was face down on a mattress, with blood and vomit on his face.  FTO Roggenkamp and the other Individual Defendants saw nothing new in Daniel at roughly the 3:00 a.m. hour, other than the fact that Daniel was unresponsive at that point.  The Individual Defendants should have taken action when they could have done so at an earlier time, when Daniel's life would have been saved if he had been taken to a local hospital emergency room.

(16)     Wheles – Medical Lieutenant

118.     Investigator Skaggs, on Friday, April 13, 2018, met with Williamson County Medical Lieutenant Wheles at Ascension Seton Williamson Hospital.  Medical Lieutenant Wheles told Investigator Skaggs that there was a lot of vomit on the floor and that, when medical staff turned Daniel over, he was blue.  Upon information and belief, this referred to the condition in which Daniel was found in Cell 7.  It also demonstrated that the trustee assigned to watch Daniel was not performing duties appropriately.  If he had done so, he would have known that Daniel had vomited and would have called for help.  However, as mentioned elsewhere in this pleading, it was deliberately indifferent and unreasonable for Williamson County to rely on such trustees to observe inmates who are on constant-watch for medical reasons and/or for suicide (as was Daniel).

D.     Post-Death Reports

1.     Autopsy Report

119.     An autopsy of Daniel's body was conducted by Suzanna Dana, a medical doctor with Central Texas Autopsy.  Dr. Dana conducted her examination on April 19, 2018 at 1:00 p.m.  Dr. Dana found no evidence of significant acute injury or trauma to Daniel's body.  Dr. Dana also found no evidence of internal trauma other than that related to resuscitating Daniel.  The toxicology

report indicated that there was no alcohol in Daniel's system.  Dr. Dana concluded that Daniel died as a result of medical complications including severe encephalomalacia and pneumonia following a hypoxic episode five days before Daniel's death.

120.    Since Daniel's date of death was listed as April 18, 2018, the hypoxic episode would have occurred on April 13, 2018.  The midnight or shortly after occurrence in which the natural person Defendants could have intervened caused, was a producing cause of, and was a proximate cause of injuries, damages, and death referenced in this pleading.  The physical examination of Daniel's body during the autopsy could not provide to Dr. Dana the precise cause of the hypoxic episode.  This is not unusual, because Dr. Dana would have needed personal knowledge of all relevant events occurring at the jail to determine "the precise cause" of Daniel's hypoxic episode.  Dr. Dana further noted that a urine drug screen done around the time of the hypoxic episode was negative for drugs of abuse, as was analysis of his serum for alcohol.  Daniel was not intoxicated.  Instead, he had pneumonia, which he had had, upon information and belief, for at least several days.  Moreover, upon information and belief, Daniel had been visibly ill to all people with whom he came in contact in the jail for at least a few days prior to April 13, 2018.  Had they chosen to act and have Daniel removed from the facility and transferred to a local hospital emergency room, Daniel would have survived.  However, they were deliberately indifferent to, and acted in an objectively unreasonable manner regarding, Daniel's visible and apparent illness.

121.    Dr. Dana, unlike a jury for this case, used the standard of "certainty" with regard to the manner of Daniel's death.  Based upon the "certainty" standard, she could not determine the manner.  However, upon information and belief, the manner of Daniel's death was illness and resulting hypoxic episode for which Daniel could have been treated – if the natural person Defendants had sought emergency medical treatment when they saw that Daniel was deathly ill.

Instead, they were deliberately indifferent to, and acted in an objectively unreasonable manner regarding, Daniel's life-threatening illness.

### 2.   Custodial Death Report

122.   The Williamson County Sheriff's Department filed a custodial death report with Ken Paxton, Attorney General of Texas.  The report was completed by Assistant Chief Deputy Randolph Doyer on May 23, 2018 at 12:28 p.m.  The report was therefore made over 30 days after Daniel's death. This violated Texas law.  Texas law required Williamson County to file a custodial report no later than 30 days after Daniel's death.

123.   The report indicates that Daniel passed away at 6:31 p.m. on April 18, 2018.  The listed manner of death is "illness."  The report admits that the condition which caused Daniel's death developed after his admission to the jail.  The report also indicates that it was "unknown" whether Daniel appeared intoxicated by alcohol or drugs.  Oddly, the report indicates that Daniel did not exhibit any medical problems.  This was false.  Daniel exhibited serious, life-threatening medical problems, which were clear and evident to all Defendants.  Further, the clear, obvious, and evident medical problems were such that even a layperson could tell that Daniel needed emergency medical treatment.  The report further indicates that Daniel made suicidal statements and exhibited mental health problems.  The summary portion of the report indicates that Daniel was found at approximately 3:00 a.m. on a date not provided in the report.

### E.   Defendants' Knowledge and Education

124.   The Texas Commission on Law Enforcement ("TCOLE") keeps records of the service histories and some training and education of the natural person Defendants and which relates to law enforcement and/or jailer activities.  TCOLE records indicate that each of the natural person Defendants had sufficient experience and/or education to be fully aware that Mr. McCoy

needed emergency medical treatment and that a failure to provide it was a violation of Daniel's rights under the United States Constitution.

125.    TCOLE records indicate the following service history for Jailer Brown:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Peace Officer (Full Time) | Killeen I.S.D. Police Dept. | Peace Officer License | 04/02/19 | |
| Peace Officer (Full Time) | Williamson County Sheriff's Office | Peace Officer License | 02/21/19 | 03/27/19 |
| Jailer (Full Time) | Williamson County Sheriff's Office | Jailer License | 02/02/18 | 03/27/19 |
| Jailer (Full time) | Williamson County Sheriff's Office | Temporary Jailer License | 01/05/18 | 02/02/18 |

126.    TCOLE records indicate the following award history for Jailer Brown:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 01/05/18 |
| Jailer License | License | Granted | 02/02/18 |
| Peace Officer License | License | Granted | 02/21/19 |
| Basic Jailer | Certificate | Certification Issued | 01/04/19 |

127.    TCOLE records indicate that Jailer Brown received the following training and/or education, through which he, upon information and belief, obtained sufficient knowledge to know that his failure to act appropriately with regard to Daniel was unreasonable, deliberately indifferent, and violated the Constitution:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3721 | County Correction Officer Field Training | 04/12/18 | 160 | Williamson County Sheriff's Office Academy |
| 56003 | Excited Delirium Syndrome Training | 02/14/18 | 8 | Williamson County Sheriff's Office Academy |

| 3845 | CPR | 02/02/18 | 4 | Williamson County Sheriff's Office Academy |
| 1007 | Basic County Jail Course | 02/01/18 | 104 | Williamson County Sheriff's Office Academy |
| 4900 | Mental Health Training for Jailers | 01/29/18 | 8 | Williamson County Sheriff's Office Academy |
| 1000643 | Basic Peace Officer Course (643) | 10/17/15 | 643 | Capital Area Council of Governments |
| 101 | Addendum Basic Peace Officer | 10/17/15 | 68 | Capital Area Council of Governments |
| 1000 | Basic Peace Officer | 12/01/99 | 610 | University of Houston – Downtown LEA |

128.    TCOLE records indicate the following service history for Sergeant Nira:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer | Williamson County Sheriff's Office | Jailer License | 10/01/03 | 15 yrs., 10 months |

129.    TCOLE records also indicate the following award information for Sergeant Nira:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 10/08/03 |
| Jailer License | License | Granted | 11/05/03 |
| Basic Jailer | Certificate | Certification Issued | 10/06/04 |
| Intermediate Jailer Proficiency | Certificate | Certification Issued | 10/23/17 |
| Advanced Jailer Proficiency | Certificate | Certification Issued | 10/23/17 |
| Mental Health Officer | Certificate | Certification Issued | 11/20/18 |
| Master Jailer Proficiency | Certificate | Certification Issued | 06/21/19 |

130.    TCOLE records indicate that Sergeant Nira received the following training and/or

education, through which he, upon information and belief, obtained sufficient knowledge to know

that his failure to act appropriately with regard to Daniel was unreasonable, deliberately indifferent, and violated the Constitution:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 301 | Jail Administrator Examination (TCJS) | 02/19/19 | 2 | TCOLE Online |
| 4900 | Mental Health Training for Jailers | 01/09/19 | 8 | Williamson County Sheriff's Office Academy |
| 1000643 | Basic Peace Officer Course (643) | 10/23/18 | 643 | Central Texas College Police Academy and Law Enfor |
| 3925 | Ethics for Law Enforcement Distance | 06/01/18 | 4 | TCOLE Online |
| 3737 | New Supervisor's Course | 12/15/17 | 40 | Williamson County Sheriff's Office Academy |
| 3501 | Suicide Detection and Prevention in Jails (Inter) | 10/18/17 | 8 | OSS Academy |
| 3502 | Inmate Rights and Privileges (Intermediate) | 10/18/17 | 16 | OSS Academy |
| 3841 | Crisis Intervention Training | 11/15/16 | 16 | Williamson County Sheriff's Office |
| 4001 | Mental Health Officer Training Course | 08/04/16 | 40 | Capital Area Council of Governments |
| 52004 | Jail Psychiatric Care System | 03/04/15 | 8 | Capital Area Council of Governments |
| 3737 | New Supervisor's Course | 11/06/13 | 24 | Williamson County Sheriff's Office |
| 3500 | Jail | 10/20/10 | 8 | Williamson County Sheriff's Office |
| 3503 | Interpersonal Communications Corr. Setting (Inter) | 10/24/03 | 24 | Williamson County Sheriff's Office |
| 3500 | Jail | 10/22/03 | 24 | Williamson County Sheriff's Office |
| 1007 | Basic County Jail Course | 10/12/03 | 96 | Williamson County Sheriff's Office |

131.    TCOLE records indicate the following service history for Jailer Paniagua:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer | Williamson County Sheriff's Office | Jailer License | 10/01/03 | 15 yrs., 10 months |

132.    TCOLE records indicate the following award history for Jailer Paniagua:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 10/08/03 |
| Jailer License | License | Granted | 11/05/03 |
| Basic Jailer | Certificate | Certification Issued | 10/06/04 |
| Intermediate Jailer Proficiency | Certificate | Certification Issued | 05/15/14 |

133.    TCOLE records indicate that Jailer Paniagua received the following training and/or education, through which he, upon information and belief, obtained sufficient knowledge to know that his failure to act appropriately with regard to Daniel was unreasonable, deliberately indifferent, and violated the Constitution:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 4900 | Mental Health Training for Jailers | 04/04/19 | 8 | Williamson County Sheriff's Office Academy |
| 3519 | Objective Jail Classification | 12/31/18 | 4 | TEEX Central Texas Police Academy |
| 301 | Jail Administrator Examination (TCJS) | 12/05/18 | 2 | TCOLE Online |
| 3521 | The Basics of Minimum Jail Standards | 11/06/18 | 8 | Bill Blackwood LEMI of Texas |
| 3737 | New Supervisor's Course | 12/15/17 | 40 | Williamson County Sheriff's Office Academy |
| 3521 | The Basics of Minimum Jail Standards | 11/15/16 | 8 | Bill Blackwood LEMI of Texas |

| 3925 | Ethics of Law Enforcement Distance | 10/04/16 | 4 | TCOLE Online |
|------|------|------|------|------|
| 3502 | Inmate Rights and Privileges (Intermediate) | 02/06/14 | 16 | Williamson County Sheriff's Office |
| 4040 | Mental Impairment (General) | 08/04/11 | 8 | Williamson County Sheriff's Office |
| 35001 | Inmates with Mental Illness DE | 07/16/11 | 5 | TCOLE Online |
| 35002 | Suicide Prevention in Corrections (DE) | 07/16/11 | 4 | TCOLE Online |
| 35001 | Inmates with Mental Illness DE | 05/01/09 | 5 | TCOLE Online |
| 3501 | Suicide Detection and Prevention in Jails (Inter) | 08/31/08 | 16 | TEEX Central Texas Police Academy |
| 3502 | Inmate Rights and Privileges (Intermediate) | 07/31/08 | 16 | TEEX Central Texas Police Academy |
| 35002 | Suicide Prevention in Corrections (DE) | 10/12/07 | 4 | TCOLE Online |
| 35003 | Legal Liabilities for Jailers (DE) | 10/12/07 | 3 | TCOLE Online |
| 32006 | Overview of Drugs (DE) | 05/17/07 | 3 | TCOLE Online |
| 35001 | Inmates with Mental Illness DE | 05/10/07 | 5 | TCOLE Online |
| 35002 | Suicide Prevention in Corrections (DE) | 02/15/07 | 4 | TCOLE Online |
| 35003 | Legal Liabilities for Jailers (DE) | 07/24/06 | 3 | TCOLE Online |
| 35002 | Suicide Prevention in Corrections (DE) | 06/13/05 | 4 | TCOLE Online |
| 32006 | Overview of Drugs (DE) | 06/07/05 | 3 | TCOLE Online |
| 35003 | Legal Liabilities for Jailers (DE) | 05/30/05 | 3 | TCOLE Online |
| 35001 | Inmates with Mental Illness DE | 05/24/05 | 5 | TCOLE Online |
| 3503 | Interpersonal Communications | 10/24/03 | 24 | Williamson County Sheriff's Office |

|  |  |  |  |  |
|---|---|---|---|---|
|  | Corr. Settings (Inter) |  |  |  |
| 3500 | Jail | 10/22/03 | 24 | Williamson County Sheriff's Office |
| 1007 | Basic County Jail Course | 10/12/03 | 96 | Williamson County Sheriff's Office |

134.    TCOLE records indicate the following service history for Jailer Roggenkamp:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer | Williamson County Sheriff's Office | Jailer License | 06/25/14 | 5 yrs., 10 months |
| Jailer (Full Time) | Williamson County Sheriff's Office | Temporary Jailer License | 08/16/13 | 06/25/14 |

135.    TCOLE records indicate the following award history for Jailer Roggenkamp:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 08/16/13 |
| Jailer License | License | Granted | 06/25/14 |
| Basic Jailer | Certificate | Certification Issued | 08/01/14 |

136.    TCOLE records indicate that Jailer Roggenkamp received the following training and/or education, through which he, upon information and belief, would have obtained sufficient knowledge to know that his failure to act appropriately with regard to Daniel was unreasonable, deliberately indifferent, and violated the Constitution:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 4900 | Mental Health Training for Jailers | 04/04/19 | 8 | Williamson County Sheriff's Office Academy |
| 3702 | Field Training Officer | 04/05/17 | 24 | Williamson County Sheriff's Office |
| 56003 | Excited Delirium Syndrome Training | 06/27/14 | 8 | Williamson County Sheriff's Office |
| 1007 | Basic County Jail Course | 06/24/14 | 104 | Williamson County Sheriff's Office |

| 3721 | County Correction Officer Field Training | 01/28/14 | 160 | Williamson County Sheriff's Office |
|------|------------------------------------------|----------|-----|------------------------------------|
| 3500 | Jail | 08/16/13 | 8 | Williamson County Sheriff's Office |

F.      Texas Commission on Jail Standards

137.    Plaintiff's counsel attempted to obtain records from the Texas Commission on Jail Standards regarding Daniel's death. However, Williamson County objected to the Public Information Act request. Upon information and belief, Williamson County objected because it knew that it was liable for Daniel's death and wanted to hide from the public what happened.

G.      *Monell* Liability of Williamson County

1.      Introduction

138.    Plaintiff sets forth in this section of the pleading additional facts and allegations supporting *Monell* liability claims against Williamson County. It is Plaintiff's intent that all facts asserted in this pleading relating to policies, practices, and/or customs of Williamson County support such *Monell* liability claims, and not just facts and allegations set forth in this section. Such policies, practices, and customs alleged in this pleading were moving forces behind and proximately caused the constitutional violations and damages asserted herein.

139.    Williamson County knew, when it incarcerated Daniel, that its personnel, policies, practices, and/or customs were such that it could not need its constitutional obligations to provide appropriate medical treatment and/or mental health treatment to Daniel. Williamson County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of Williamson County as it related to its jail.

140.     There were several policies, practices, and/or customs at the Williamson County jail which were moving forces behind, caused, were producing causes of, and/or proximately caused Mr. McCoy's suffering, death, and other damages referenced in this pleading.  The County made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist. Further, when the County implemented and/or consciously allowed to exist such policies, practices, and/or customs, the County knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

### 2.     Jail Policy Manual

141.     The Williamson County Sheriff's Office produced a copy of its policy manual prior to the filing of this lawsuit, as a result of a Public Information Act request.  Interestingly, in response to numerous other Public Information Act requests, Williamson County objected and refused to produce information and/or documents.  The manual indicates that "[o]nly the Sheriff determines policy."  In addition to the Sheriff being the chief policymaker, policies, practices, and/or customs have developed over time, which may or may not differ from written policies adopted for the Williamson County jail.

### 3.     Inmates Allowed to Supervise Other Inmates

142.     Williamson County had a policy of using trustees to keep track of inmates, including but not limited to Daniel.  Trustees are inmates, held in jail for alleged commission of one or more crimes.  Upon information and belief, trustees would observe inmates who were suicidal and/or who had serious medical and/or mental health issues. Williamson County's written trustee policy, regarding trustees inside the jail, had meager qualifications for such trustee.  Jail trustees could not have any felony escape convictions or attempts to escape from secured

institutional custody; could not have been convicted of a capital crime or an aggravated crime against persons; had to be medically and psychologically cleared; had to have a "reasonably good" conduct record; and had to have a prison sentence with five years or less.  Thus, while the Williamson County jail was required to use licensed jailers in its jail, Williamson County chose to use trustee-inmates with a background and history which would not allow such trustees to be hired as jailers. This policy, practice, and/or custom was a moving force behind and proximately caused, or was a producing cause of, all injuries and damages referenced in this pleading (including Daniel's death).

> 4.  Failing to Fund Mental Health Treatment and Allowing Prisoners to Wait Months to be Transferred to A Mental Health Hospital

143.  The Williamson County jail policy manual indicates that the Williamson County Commissioners' Court appropriates funds for the jail, while the Williamson County Sheriff's Office provides management and personnel for medical services to inmates.  Such personnel could include physicians, medical directors, psychologists, dentists, physician's assistants, registered nurses, licensed locational nurses, and medical assistants. The Williamson County Commissioner' Court, as a policymaker and in the alternative chief policymaker for Williamson County regarding funding for such services, upon information and belief, made the decision  not to provide sufficient funding for prisoners such as Daniel who needed emergency mental health treatment.  As shown elsewhere in this pleading, Daniel was on a several-month-long waiting list to be transferred to the State hospital in Vernon.  Williamson County chose, as a result of choosing not to fund such needed mental health services, to allow Daniel and others similarly situated to suffer with severe mental health issues – for months – potentially in essentially a metal box as that in which Daniel was housed.  This policy, practice, and/or custom was a moving force behind and proximately

caused, or was a producing cause of, all injuries and damages referenced in this pleading (including Daniel's death).

### 5.      Incompetent Jail Medical Personnel

144.      Upon information and belief, Williamson County did not have competent, well-trained, and/or appropriately supervised personnel to deal with inmates having serious medical episodes.  Upon information and belief, additional evidence will be adduced in this case to show that the medical services department was, as a whole, incompetent.  That evidence will include information about the failure to keep equipment such as the suction equipment used during Daniel's medical emergency, operating appropriately, improper messages and/or texts between medical personnel about Daniel, and information about a general lack of care and deliberate indifference.  This policy, practice, and/or custom was a moving force behind and proximately caused, or was a producing cause of, all injuries and damages referenced in this pleading (including Daniel's death).

### 6.      Williamson County Violated Court Orders to Help Mentally Ill Inmates

145.      As shown in this pleading, the Williamson County Sheriff was ordered to move Daniel to an appropriate mental health facility.  This order was signed by a district judge in Williamson County.  However, Williamson County ignored that order and continued to house Daniel, and punish him even though he was a pre-trial detainee who had been found mentally incompetent to stand trial, by keeping him in the Williamson County jail.  Daniel was kept as indicated elsewhere in this pleading in essentially a metal box.  Upon information and belief, this was a typical County policy, practice, and/or custom.  Upon information and belief, the Sheriff of Williamson County and others pursuant to his authority violated other court orders such as that applicable to Daniel.  This policy, practice, and/or custom was a moving force behind and

proximately caused, or was a producing cause of, all injuries and damages referenced in this pleading (including Daniel's death).

### 7.      Taking Vital Signs During a Medical Incident Optional

146.      Upon information and belief, evidence will be adduced which will indicate that Williamson County did not have a policy requiring medical personnel in the jail to take vital signs in the event of a medical incident.  Upon information and belief, there is no requirement that medical officers, such as Sergeant Nira, take blood pressure, pulse, temperature, respiration, and similar readings for an inmate experiencing a significant medical episode.  The lack of such a policy, and thus the resulting practice and/or custom, was a moving force behind and proximately caused, or was a producing cause of, all injuries and damages referenced in this pleading (including Daniel's death).

### 8.      Housing Mentally and Physically Ill Prisoners in a Metal Box with a Single Window

147.      Williamson County chose to house inmates such as Daniel in cells which were essentially metal boxes, with a single window in the cell door.  This practice, together with serious psychiatric issues, caused unnecessary additional psychiatric issues, mental anguish, and emotional distress.  Thus, it increased the effects of mental illness.  This policy, practice, and/or custom was a moving force behind and proximately caused, or was a producing cause of, all injuries and damages referenced in this pleading (including Daniel's death).

### 9.      Intoxicated Prisoners Allowed

148.      Upon information and belief, the Williamson County jail was such a lax facility that intoxication of inmates was a frequent occurrence.  Records in this case indicate that jailers accused Daniel of being intoxicated (even though they knew he was not).  Those records do not indicate that there was any shock among jailers that an inmate would be severely intoxicated.

Upon information and belief, this is a demonstration of the fact that Williamson County inmates would frequently become intoxicated by substances which should not be in a jail setting.  Such a lax policy regarding inmate intoxication leads and did lead jailers and others in this case to be lax about inmate illness and care.  This policy, practice, and/or custom was a moving force behind and proximately caused, or was a producing cause of, all injuries and damages referenced in this pleading (including Daniel's death).

10.     Prisoner Observations Through a "Bean Hole"

149.    Williamson County allowed inmates such as Daniel to be kept in cells and allegedly "watched" only through the bean hole in the door.  These are cells without bars.  Cells with bars enable inmates to be observed more easily.  Daniel was kept during the beginning of the incident referenced in this pleading, as well as when he was moved, in cells with a bean hole slot.  No person watching an inmate through a "bean hole" would do so without significant periods not watching the inmate.  In fact, allowing inmates to be viewed through merely a "bean hole" is deliberate indifference to the needs of such inmates.   This policy, practice, and/or custom was a moving force behind and proximately caused, or was a producing cause of, all injuries and damages referenced in this pleading (including Daniel's death).

11.     Inoperable Medical Equipment

150.    Upon information and belief, it was a Williamson County jail practice and/or custom to not require periodic maintenance and inspection of life-saving medical equipment.  As shown elsewhere in this pleading, suction equipment did not work appropriately when it was needed to attempt to save Daniel's life.  Upon information and belief, information will be adduced through discovery indicating that Williamson County was deliberately indifferent to keeping life-saving medical equipment in good working order.  This policy, practice, and/or custom was a

moving force behind and proximately caused, or was a producing cause of, all injuries and damages referenced in this pleading (including Daniel's death).

III.    Causes of Action

    A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

151.    In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him.  *Id*. at 2470.  The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable."  *Id.*  (emphasis in original).  The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant.  *Id.*  The Court did so, acknowledging and resolving disagreement among the Circuits.  *Id.* at 2471-72.

152.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove."  *Id.* at 2472.  Instead, "courts must use an objective standard."  *Id* at 2472-73.  "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable."  *Id.* at 2473.  Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard.  Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

153.     It appears that this objective reasonableness standard is now the law of the land.  In *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983.  *Id.* at 418.  The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment."  *Id.* at 419 (citation omitted).  The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case.  *Id.* at 419-20.  A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless."  *Id.* at 420 (citation omitted).  However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit.  *Id.* at 420 and 424-25.[1]

---

[1] Circuit Judge Graves wrote: "I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996).  In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the force they used against Kingsley."  *Kingsley*, 135 S.Ct. at 2472.  However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the majority determined in *Hare*.  Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

> We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners.  We are not confronted with such a claim, however, so we need not address that issue today.

*Id.* at 2476.  This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards

154.    The majority opinion gave only three reasons for the court's determination that the law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's "rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id.* Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent, because it would not have changed the results in *Alderson*. *Id.* Even so, the Fifth Circuit noted, nearly twenty-five years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

155.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' or jailers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment. The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case. The court

---

were to be commingled, it would be toward an objective standard as to both on at least some claims.

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees." *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015). The en banc court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*. Likewise, the two subsequent cases also cited by the majority did not address or distinguish *Kingsley*. *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016). Because I read *Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately."

should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme

Court discarded the idea that a non-convicted plaintiff should have such a burden.

      B.        Remedies for Violation of Constitutional Rights and Other Federal Claims

156.     The United States Court of Appeals for the Fifth Circuit has held that using a State's

wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to

42 U.S.C. § 1983.  Therefore, Plaintiff individually, as Daniel's heir, and for and on behalf of

Claimant Heirs, seeks, for causes of action asserted in this complaint, all remedies and damages

available pursuant to Texas and federal law, including but not necessarily limited to the Texas

wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute

(Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related

and/or supporting case law.  If Daniel had lived, he would have been entitled to bring a 42 U.S.C.

§ 1983 action for violation of the United States Constitution, and actions for violation of the

Americans with Disabilities Act and Rehabilitation Act, and obtain remedies and damages

provided by Texas and federal law.  Plaintiff incorporates this remedies section into all sections in

this complaint asserting cause(s) of action.

      C.       Cause of Action Against All Natural Person Defendants Under 42 U.S.C. § 1983
                for Violation of 14th Amendment Due Process Rights to Reasonable Medical
                and/or Mental Health Care, to be Protected, and not to be Punished

157.     In the alternative, without waiving any of the other causes of action pled herein,

without waiving any procedural, contractual, statutory, or common-law right, and incorporating

all other allegations herein (including all allegations in the "Factual Allegations" section above) to

the extent they are not inconsistent with the cause of action pled here, all natural person Defendants

(Bradley R. Brown, Adrian D. Nira, Carlos A. Paniagua, and Ty R. Roggenkamp) are liable to

Plaintiff individually and as Daniel's heir, and to Claimant Heirs, pursuant to 42 U.S.C. § 1983,

for violating Daniel's rights to reasonable medical care, to be protected, and not to be punished as a pretrial detainee. These rights are guaranteed by the 14th Amendment to the United States Constitution. Pre-trial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals. Pre-trial detainees are also entitled to protection, and also not to be punished at all since they have not been convicted of any crime resulting in their incarceration.

158.     Individual Defendants acted and failed to act under color of state law at all times referenced in this pleading. They wholly or substantially ignored Daniel's obvious serious medical needs, and they were deliberately indifferent to those needs. They failed to protect Daniel, and their movement of him to a cell to die alone after they knew he was deathly ill, as well as other actions and/or inaction described in this pleading, resulted in unconstitutional punishment of Daniel. Individual Defendants were aware of the excessive risk to Daniel's health and safety and were aware of facts from which an inference could be drawn of serious harm, suffering, and death. Moreover, they in fact drew that inference. Individual Defendants violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents.

159.     Individual Defendants are also liable pursuant to the theory of bystander liability. Bystander liability applies when the bystander jailer/officer (1) knows that a fellow jailer/officer is violating a person's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act. As demonstrated through facts asserted in this pleading, Individual Defendants' actions and inaction meet all three elements. All Individual Defendants, regardless of their rank as compared to other Individual Defendants or other Williamson County jail employees, could call "911," could go up the chain of rank, or call another law enforcement

organization to obtain desperately needed help for Daniel. They chose not to do so. Therefore, Individual Defendants are also liable to Plaintiff individually and as Daniel's heir, and to Claimant Heirs, pursuant to this theory.

160.    In the alternative, Individual Defendants' deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined the state of mind necessary, if any, for officers/jailers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id* at 2470-71. Constitutional rights set forth in this section of the pleading, and constitutional rights affording pretrial detainees protection against excessive force, all flow from the 14th Amendment's Due Process Clause. *Id.* Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations is identical.

161.    Individual Defendants are not entitled to qualified immunity.[2]   Their denial of

---

[2]   The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted. Congress makes laws. Courts do not. However, the qualified immunity defense was invented by judges. When judges make law, they violate the separation of powers doctrine of the United States Constitution. Plaintiff respectfully makes a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

The natural person Defendants cannot show that they would fall within the category of persons referenced in the second sentence of this footnote. This would be Defendants' burden, if they choose to assert the alleged defense. Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring). Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights. Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre

reasonable medical and mental health care, and other actions and/or inaction set forth in this pleading, caused, proximately caused, and/or were producing causes of Daniel's suffering and death and other damages mentioned and/or referenced in this pleading, including but not limited to those suffered by Amanda McCoy and Claimant Heirs.

162.    Therefore, Daniel's estate and/or his heirs at law (Amanda McCoy and Claimant Heirs) suffered the following damages, for which they seek recovery from natural person Defendants:

- Daniel's conscious physical pain, suffering, and mental anguish;

- Daniel's medical expenses;

- Daniel's funeral expenses;  and

- exemplary/punitive damages.

163.    Amanda McCoy also individually seeks and is entitled to all remedies and damages available to her for 42 U.S.C. § 1983 claims.  Amanda McCoy seeks those damages due to the wrongful death of her son.  Those damages were caused and/or proximately caused by Individual Defendants.  Therefore, their actions caused, were a proximate cause of, and/or were a producing

---

Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases).  Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity.  *Schwartz, supra* at 1798–99.  *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting). Additionally, qualified immunity violates the separation of powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3).  Plaintiff includes allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

cause of the following damages suffered by Amanda McCoy, for which she individually seeks compensation:

- loss of services that Amanda McCoy would have received from Daniel;

- expenses for Daniel's funeral;

- past mental anguish and emotional distress suffered by Amanda McCoy resulting from and caused by Daniel's death;

- future mental anguish and emotional distress suffered by Amanda McCoy resulting from and caused by Daniel's death;

- loss of companionship and society that Amanda McCoy would have received from Daniel; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Daniel's constitutional rights. Individual Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, Daniel's rights and safety. Moreover, Amanda McCoy individually and as Daniel's heir, and also on behalf of Claimant Heirs, seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

> D.     Cause of Action Against Williamson County Under 42 U.S.C. § 1983 for Violation of 14th Amendment Due Process Rights to Reasonable Medical and Mental Health Care, to be Protected, and not to be Punished

164.     In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Williamson County is liable to Plaintiff individually and as Daniel's heir, and to Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating Daniel's rights to reasonable medical care, to be protected, and not to be punished as a pre-trial detainee. These rights are guaranteed by the 14th Amendment to the

United States Constitution.  Pretrial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals.  They are also entitled to be protected and not to be punished at all, since they have not been convicted of any crime resulting in their incarceration.

165.    Williamson County acted or failed to act, through natural persons including Individual Defendants, under color of State law at all relevant times.  Williamson County's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate causes of Mr. McCoy's suffering, damages, death, and the damages suffered by Plaintiff individually and as Daniel's heir, and damages suffered by Claimant Heirs.

166.    The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the appropriate policymaker at the pleadings stage.  Nevertheless, out of an abundance of caution, the sheriff of Williamson County was the relevant chief policymaker over matters at issue in this case.  Moreover, in addition, and in the alternative, the jail administrator was the relevant chief policymaker over matters at issue in this case.  Finally, in addition, and in the alternative, the County's commissioners' court was the relevant chief policymaker.

167.    Williamson County was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to Williamson County prisoners with serious medical and/or mental health issues, as evidenced by allegations set forth above.  Williamson County also acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of Daniel's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.  Williamson County's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied

to Daniel.

168.    Therefore, Daniel's estate and/or his heirs at law (Amanda McCoy and Claimant Heirs) suffered the following damages, for which they seek recovery from Williamson County:

- Daniel's conscious physical pain, suffering, and mental anguish;

- Daniel's medical expenses; and

- Daniel's funeral expenses.

169.    Amanda McCoy also individually seeks and is entitled to all remedies and damages available to her for the 42 U.S.C. § 1983 violations.  Amanda McCoy seeks those damages due to the wrongful death of her son.  Williamson County's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by Amanda McCoy, for which she individually seeks compensation:

- loss of services that Amanda McCoy would have received from Daniel;

- expenses for Daniel's funeral;

- past mental anguish and emotional distress suffered by Amanda McCoy resulting from and caused by Daniel's death;

- future mental anguish and emotional distress suffered by Amanda McCoy resulting from and caused by Daniel's death; and

- loss of companionship and society that Amanda McCoy would have received from Daniel.

Moreover, Amanda McCoy individually, and as Mr. McCoy's heir, and also on behalf of Claimant Heirs, seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

E.    Causes of Action Against Williamson County for Violation of Americans with Disabilities Act and Rehabilitation Act

170.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Williamson County is liable to Plaintiff (Amanda McCoy) pursuant to the Americans with Disabilities Act ("ADA") and federal Rehabilitation Act.  Upon information and belief, Williamson County has been and is a recipient of federal funds.  Therefore, it is covered by the mandate of the federal Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental and physical disabilities in their facilities, program activities, and services, and also reasonably modify such facilities, services, and programs to accomplish this purpose. Further, Title II of the ADA applies to Williamson County and has the same mandate as the Rehabilitation Act.  Claims under both the Rehabilitation Act and ADA are analyzed similarly.

171.    The Williamson County jail is a "facility" for purposes of both the rehabilitation and ADA, and the jail's operation comprises a program and services for Rehabilitation Act and ADA purposes.  Daniel a qualified individual for purposes of the Rehabilitation Act and ADA, regarded as having a mental impairment and/or medical condition that substantially limited one or more of his major life activities.  Daniel was therefore disabled.  Daniel was also discriminated against by reason of his disability.  Opon information and belief, discovery in this case will show that medical officers in the Williamson County jail communicated improperly about Daniel, possibly making fun of him and/or demonstrating though their words that they discriminated against Daniel based on his mental health issues.  This belief is based in part on Medical Officer Banks' statement referenced above.

172.    A majority of circuits have held, for purposes of Rehabilitation Act and ADA claims, that one may prove intentional discrimination by showing that a defendant acted with deliberate indifference.   The Fifth Circuit has, as yet, declined to follow the majority view. Nevertheless, intent can never be shown with certainty.  Direct and circumstantial evidence can be used to support an "intent" jury finding, and allegations in this pleading show that there is more than enough of both.

173.    Williamson County's failure and refusal to accommodate Daniel's mental and/or medical disabilities while in custody violated the Rehabilitation Act and the ADA.  Williamson County, among other things referenced above, chose to house Daniel in essentially a metal box, for lengthy periods, knowing that he was mentally unstable and needed immediate psychological treatment.  Williamson County chose not to transfer Daniel to an appropriate facility due to, among potentially other things, its decision not to fund treatment needed by Daniel.  Such failure and refusal caused, proximately caused, and was a producing cause of Daniel's suffering and death and Amanda McCoy's damages.

174.    Williamson County's violations of the Rehabilitation Act and the ADA included the failure to reasonably modify facilities, services, accommodations, and programs to reasonably accommodate Daniel's disabilities.   These failures and refusals, which were intentional, proximately caused Daniel's death and Amanda McCoy's damages.  Because Daniel's death resulted from Williamson County's intentional discrimination against him, Amanda McCoy is entitled to the maximum amount of compensatory damages allowed by law.  Amanda McCoy seeks all such damages itemized in the prayer and or body in this pleading (including sections above giving appropriate and fair notice of Amanda McCoy's 42 U.S.C. § 1983 claims and

resulting damages) to the extent allowed by the Rehabilitation Act and the ADA, and Plaintiff also seek reasonable and necessary attorneys' fees and other remedies afforded by those laws.

IV.      Concluding Allegations and Prayer

      A.      Conditions Precedent

175.      All conditions precedent to assertion of all claims herein have occurred.

      B.      Use of Documents at Trial or Pretrial Proceedings

176.      Plaintiff and Claimant Heirs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

      C.      Jury Demand

177.      Plaintiff and Claimant Heirs demand a jury trial on all issues which may be tried to a jury.

      D.      Prayer

178.      For these reasons, Plaintiff asks that Defendants be cited to appear and answer, and that Plaintiff and Claimant Heirs have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

        a)      actual damages of and for Amanda McCoy, individually and as Daniel's heir (asserted in Amanda McCoy's capacity as administrator of Daniel's estate),  including but not necessarily limited to:

          •      loss of services that Amanda McCoy would have received from Daniel;

          •      medical expenses for Daniel;

- •      expenses for Daniel's funeral;

- •      past mental anguish and emotional distress resulting from and caused by Daniel's death;

- •      future mental anguish and emotional distress resulting from and caused by Daniel's death;

- •      loss of companionship and society that he would have received from Daniel; and

- •      Daniel's conscious pain and suffering;

b)      actual damages of and for the Claimant Heirs, including but not necessarily limited to:

- •      medical expenses for Daniel;

- •      expenses for Daniel's funeral; and

- •      Daniel's conscious pain and suffering;

c)      exemplary/punitive damages for Amanda McCoy, individually and as Daniel's heir (asserted in Amanda McCoy's capacity as administrator of the estate), and the Claimant Heirs, from the natural person Defendants;

d)      reasonable and necessary attorneys' fees for Amanda McCoy, individually and as the heir of Daniel (asserted in Amanda McCoy's capacity as administrator of the estate), and the Claimant Heirs, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988, the ADA, and the Rehabilitation Act;

e)      court costs and all other recoverable costs;

f)      prejudgment and postjudgment interest at the highest allowable rates; and

g)      all other relief, legal and equitable, general and special, to which Amanda McCoy, individually and as the heir of Daniel (asserted in Amanda

McCoy's capacity as administrator of the estate), and the Claimant Heirs are entitled.

Respectfully submitted,

_____/s/ T. Dean Malone_____
T. Dean Malone
Attorney-in-charge
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904
dean@deanmalone.com

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:         (214) 670-9904
michael.oconnor@deanmalone.com